IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JEAN ANN MUMFORD, SPIRIT )
ENTERPRISES INC., KARYN )
DELANEY, and BLUE SEA )
ENTERPRISES, INC., )
       Plaintiffs, )
  )
v. )     Civil Action No. 05-1280
  )
  )
GNC FRANCHISING LLC, GENERAL )
NUTRITION CORP., GENERAL )
NUTRITION DISTRIBUTION CORP., and )
APOLLO MANAGEMENT LP, )
  )
       Defendants. )

MEMORANDUM ORDER

CONTI, District Judge.

      Jean Anne Mumford ("Mumford"), Spirit Enterprises, Inc., Karyn Delaney, and Blue Sea

Enterprises, Inc. (collectively, the "plaintiffs") owned and operated franchise stores subject to

franchise agreements with defendants.  Plaintiffs filed this civil action alleging various antitrust

violations under sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1, et seq. (the

"Sherman Act"), and the Robinson-Patman Price Discrimination Act, 15 U.S.C. § 13(a) (the

"Robinson-Patman Act"), and asserting state law claims for breach of contract, breach of the

implied covenant of good faith and fair dealing, breach of contract as third-party beneficiary, and

negligent and fraudulent misrepresentation.

      Pending before the court is a motion filed pursuant to Federal Rule of Civil Procedure

12(b)(6) by defendants General Nutrition Corporation ("GNC"), GNC Franchising LLC, and

General Nutrition Distribution LP (collectively, the "GNC Defendants") to dismiss plaintiffs' second amended complaint in its entirety for failure to state a claim.  (Doc. No. 28.)  On May 12, 2006, the court heard oral argument on the motion.  Because plaintiffs' claims under the Sherman Act are predicated upon a "relevant market" that is defined by the bounds of the franchise agreement and does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiffs' favor, the court finds that plaintiffs fail to state a claim under the Sherman Act.  By reason of plaintiffs' claims under the Robinson-Patman Act being predicated on a comparison between prices given by GNC to plaintiffs and prices given by GNC to its company-owned stores, entities considered to be one person with GNC for the purpose of antitrust scrutiny, the court finds that plaintiffs fail to state a claim under the Robinson-Patman Act.  The court, therefore, will grant the motion to dismiss with respect to the plaintiffs' federal antitrust claims.   The court will not address the remaining state law claims because it declines to retain jurisdiction over those claims.

### *Facts Accepted as True*

Plaintiffs owned and operated GNC franchises subject to franchise agreements executed with GNC Franchising, Inc.  Plaintiffs' Second Amended Complaint ("Pl.'s Sec. Am. Compl.") ¶1-4; Exhibits A and B to Defendants' Motion to Dismiss ("Ex.").  On September 16, 1997, Mumford and Tasha M. Fink "jointly and severally" entered into an agreement as "Franchisee" with GNC Franchising, Inc. as "Franchisor" (the "September 16, 1997 franchise agreement") for a retail store located in Bell Hollow Shopping Center in Hickory, North Carolina.  Ex. A at 1.  On April 28, 1998, Mumford and Tasha M. Fink assigned the September 16, 1997 franchise agreement to Spirit Enterprises, Inc.  Id. at Ex. 1.  On March 24, 1999, Mumford entered into

2

another agreement as "Franchisee" with GNC Franchising, Inc. as "Franchisor" (the "March 24,

1999 franchise agreement") for a retail store located in Pine Creek Center in Pittsburgh,

Pennsylvania.  Ex. B at 1.[1]

Each of the franchise agreements provided, inter alia, that franchisor GNC developed and

owns a unique and comprehensive system relating to the opening and operation of retail

nutrition, health, and fitness stores ("General Nutrition Centers"), GNC identifies elements of the

system by means of certain proprietary marks, and GNC continues to develop, use and control

the use of the proprietary marks.  Ex. A at 2; Ex. B at 2.  The agreements further provided that

GNC grants to each of the franchisees the right and franchise to operate a retail General

Nutrition Center store and to use solely in connection with the operation of that store the GNC

proprietary marks and system.  Ex. A at 9; Ex. B at 9.  The agreements set forth various other

conditions, including certain duties of the franchisor and duties of each franchisee.  Ex. A at 12-

16; Ex. B at 12-17.

For example, the September 16, 1997 franchise agreement provided that the duties of the

franchisor include making available to franchise stores standard specifications for the store,

training programs, an initial advertising and promotional package, and administrative and

accounting forms.  Ex. A at 12.  It further provided that GNC will seek to maintain the high

standards of quality, appearance, and service of the system and will from time to time provide

advisory assistance to the franchise store.  Id.  The March 24, 1999 franchise agreement

---

[1] The Second Amended Complaint pleads that Karyn Delaney and Blue Sea Enterprises,
Inc., are also GNC franchisees.  The record, however, does not contain specific facts supporting
this assertion.  For the purpose of the motion to dismiss, the court shall draw all inferences in
support of plaintiffs, the non-moving party, and assume that Karyn Delaney and Blue Sea
Enterprises, Inc., are GNC franchisees.

provided similar, though not identical, terms describing GNC's duties.  Ex. B at 12-13.

The franchise agreements also provided for certain duties of the franchisees.  Ex. A at 14-16; Ex. B at 14-17.  For example, the franchise agreements required a franchisee to display prominently and maintain in the retail store signs prescribed by GNC, to maintain the store in a clean, orderly condition, and – importantly in this case – to purchase inventory from GNC or its affiliates or from an approved supplier in categories and minimum quantities specified in the GNC Inventory Plans (or "Plan-O-Grams") that are attached to the agreements.  Id.  In addition, and also germane to this case, the agreements required franchisees to sell or offer for sale only products and services that have been expressly approved in writing by GNC.  Id.  Further, the franchise agreements explicitly provided that "Franchisor reserves the right to modify the General Nutrition Center Inventory Plan, or Plan-O-Grams, by providing reasonable advance notice of such changes to Franchisee."  Ex. A at 12 (provision VI.B); Ex. B at 14 (provision VI.B).  The agreements also cover other issues relevant to the franchise arrangement including, but not limited to, confidentiality, use of proprietary marks, accounting and recordkeeping, advertising, insurance, and default and termination of the arrangement.  See Ex. A and B.

In addition to the GNC franchise stores owned and operated by plaintiffs and other franchisees, there are stores owned and operated by GNC (the "company-owned stores").  See Pl.'s Sec. Am. Compl. ¶36.  Plaintiffs set forth a variety of practices by the GNC defendants which plaintiffs allege constitute predatory behavior designed to benefit company-owned stores to the detriment of franchise stores and to ensure the failure of the franchise stores.  Id. ¶6-54, 62-63.  Some of these complaints relate to pricing at the retail stores.  For example, GNC offered promotions and discounts that were available only at company-owned stores.  Id. ¶37.  GNC advertised these specials using customer information collected in part by franchisee stores.  Id.

4

GNC used the "buying power" associated with its large number of franchises to solicit and obtain discounts from third-party vendors, manufacturers, and wholesalers for products required for the company-owned and franchise stores.  Id. ¶38.  GNC charged franchise stores, but not company-owned stores, a "marked up price" for these supplies.  Id. ¶39.  GNC periodically imposed discount programs on franchise stores.  Id. ¶42-44.  These imposed discounts were severe enough to make it difficult for franchisees to stay in business.  Id. ¶43.

Some of plaintiffs' complaints relate to obtaining products and supplies that were needed to operate successfully the stores.  For example, GNC company-owned stores sold products that were unavailable for franchise stores.  Id. ¶45.  GNC imposed "slotting" requirements to ensure that franchise stores carried the products most profitable to GNC.  Id. ¶46.  GNC restricted franchisee access to third-party vendors, refused to approve franchisee's requests to purchase third-party products, pressured third-party vendors to boycott direct sales to franchisees, and pressured third-party vendors to set minimum prices below which third-party vendors were not permitted to sell to franchisees and to raise existing prices so that franchisees instead must buy from GNC's warehouse.  Id. ¶48-50.  GNC sold products to its franchise stores at prices higher than the retail prices it offered at the company-owned stores.  Id. ¶52.

Plaintiffs allege various and sundry other complaints related to GNC's treatment of its franchisees.  For example, GNC charged outrageous franchise charges and finance charges to Mumford.  Id. ¶54.  GNC failed to enforce uniformly its requirement that franchise stores sell only approved product to the detriment of Mumford's store when a nearby franchise sold unapproved products with impunity.  Id.  GNC promised to support its franchise stores, but was not available to plaintiffs when needed.  Id. ¶56.

Plaintiffs complain that they were induced to enter into the franchise agreements without

full and complete information about the relationship that would ensue.  For example, plaintiffs allege that franchisees lack knowledge of the extent of the pricing and marketing schemes imposed by GNC when they enter the franchise relationship.  Id. ¶55.  Mumford was told by a GNC salesman that "all stores earn at least $250,000 but yours will do even better," and "if you're unhappy, we'll buy you out."  Id. ¶59.  In addition, GNC promised Mumford that the construction she needed for her North Carolina store "wouldn't cost [her] a penny," and she "wouldn't have to move a thing."  Id. ¶60.  GNC, however, charged Mumford $8,619.68 for the construction, claiming "standard procedure," as well as a $3,109 finance charge for the cost.  Id.  GNC promised extensive television advertising, but never delivered on its promise.  Id. ¶61.  GNC purchases failing franchise stores that cannot compete.  Id. ¶62.  GNC company-owned stores continue to operate in Mumford's former spaces.  Id. ¶63.

### Standard of Review

A motion to dismiss tests the legal sufficiency of the complaint.  Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits.  Rather, when considering a motion to dismiss, the court accepts as true all factual allegations in the complaint and views them in a light most favorable to the plaintiff.  U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002).  "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'"  Kost, 1 F.3d at 183 (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)).  A motion to dismiss pursuant to Rule 12(b)(6) should be granted only if, accepting as true the facts alleged and all reasonable inferences that can be drawn therefrom,

there is no reasonable reading upon which the plaintiff may be entitled to relief.  Vallies v. Sky Bank, 432 F.3d 493, 494 (3d Cir. 2006).  Moreover, the court is under a duty to examine the complaint independently to determine if the factual allegations set forth could provide relief under any viable legal theory.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

The Federal Rules of Civil Procedure do not require the plaintiff to set out in his complaint the specific facts that entitle him to relief, but rather only a "short and plain statement of the claim."  FED. RULE CIV. P. 8(a)(2).  Where the plaintiff's complaint, however, pleads facts beyond the requirements of Rule 8, his claim may be subject to dismissal if the specific facts alleged fail to provide relief under any viable legal theory.  Camero v. Kostos, 253 F. Supp. 331, 338 (D.N.J. 1966) (granting motion to dismiss where plaintiff's complaint pled facts demonstrating defendant was subject to immunity).  In addition, if the plaintiff's complaint does plead specific facts, those facts, taken as true for purposes of deciding the motion to dismiss, may create a defense to his claim. Id.; see ALA, Inc. v. CCAir, Inc., 29 F.3d 855, 859 (3d Cir. 1994); 5 CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1226 (3d ed. 2004).  In fact, where the plaintiff "chooses to plead particulars, and they show that he has no claim, then he is out of luck – he has pleaded himself out of court."  Jefferson v. Ambroz, 90 F.3d 1291, 1296 (7th Cir. 1996).

Plaintiffs' antitrust claims are not subject to a heightened standard of pleading.  See Lum v. Bank of America, 361 F.3d 217, 220 (3d Cir. 2004) (holding that antitrust claim predicated on fraud must be pled with particularity, but noting that antitrust claims generally are not subject to the heightened pleading requirement of Rule 9(b)); see also Swierkiewicz v. Sorema N.A., 534 U.S. 512, 512-13 (2002) (citing Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168-69 (1993) (explaining that the simplified pleading

7

standard set forth in Rule 8 applies in all civil actions unless the limited circumstances set forth

in Rule 9 apply)).  While relevant market determinations involved in antitrust cases can be fact

intensive, and therefore sometimes inappropriate for disposition on a Rule 12(b)(6) motion, there

is no per se prohibition against dismissal of antitrust claims under Rule 12(b)(6).  Queen City

Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997).

Exhibits, such as the franchise agreements attached in the appendix to defendants'

motion, may be considered in deciding the motion to dismiss because "matters incorporated by

reference or integral to the claim, items subject to judicial notice, matters of public record,

orders, [and] items appearing in the record of the case . . . may be considered by the district court

without converting the motion into one for summary judgment."  5B CHARLES A. WRIGHT &

ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1357 at 376, 387-92 (3d ed. 2004).

Specifically, without converting the motion into a motion for summary judgment, the court may

consider "documents which are attached to or submitted with the complaint, as well as legal

arguments presented in memorandums or briefs and arguments of counsel,"  "documents whose

contents are alleged in the complaint and whose authenticity no party questions, but which are

not physically attached to the pleading," and "[d]ocuments that the defendant attaches to the

motion to dismiss [that are] are considered part of the pleadings if they are referred to in the

plaintiff's complaint and are central to the claim." Pryor v. National Collegiate Athletic Ass'n,

288 F.3d 548, 560 (3d Cir. 2002); see U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d

Cir. 2002) ("Although a district court may not consider matters extraneous to the pleadings, 'a

document integral to or explicitly relied upon in the complaint may be considered without

converting the motion to dismiss into one for summary judgment.'") (quoting In re Burlington

Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997)).

*Discussion*

## I. Federal Antitrust Claims

### A. The Context of the Franchisor – Franchisee Relationship

Analysis of antitrust claims must take into account the particular facts of a case and the economic and legal circumstances of the parties.  See Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 412 (2004) ("Antitrust analysis must always be attuned to the particular structure and circumstances of the industry at issue."); Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 466-67 (1992) ("Legal presumptions that rest on formalistic distinctions rather than actual market realities are generally disfavored in antitrust law."); Queen City Pizza, 124 F.3d at 436; Concord v. Boston Edison Co., 915 F.2d 17, 22 (1st Cir. 1990) (Breyer, C.J.) ("[A]ntitrust analysis must sensitively 'recognize and reflect the distinctive economic and legal setting' of the regulated industry to which it applies.") (quoting Watson & Brunner, Monopolization by Regulated "Monopolies": The Search for Substantive Standards, 22 Antitrust Bull. 559, 565 (1977)).  In light of the facts pled in the complaint, drawing all reasonable inferences in favor of plaintiffs, the issues raised in this motion, therefore, must be considered in light of the specific economic context in which they arise—that is, the issues must be considered in the context of a dispute between a franchisor and certain of its franchisees relating to rights and duties set forth in franchise agreements executed by and between them.

Franchising is a well-accepted and popular form of business organization in the United States.  See Queen City Pizza,124 F.3d at 440 ("Franchising is a bedrock of the American economy.").  Under Pennsylvania law:

"In its simplest terms, a franchise is a license from the owner of a trademark or

> trade name permitting another to sell a product or service under the name or mark.  More broadly stated, the franchise has evolved into an elaborate agreement by which the franchisee undertakes to conduct a business or sell a product or service in accordance with methods and procedures prescribed by the franchisor, and the franchisor undertakes to assist the franchisee through advertising, promotion and other advisory services."  Piercing Pagoda, Inc. v. Hoffner, 465 Pa. 500, 508-09, 351 A.2d 207, 211 (1976).  "(T)he cornerstone of a franchise system must be the trademark or trade name of a product. It is this uniformity of product and control of its quality and distribution which causes the public to turn to franchise stores for the product."  Susser v. Carvel Corp., 206 F.Supp. 636, 640 (S.D.N.Y.1962), aff'd, 332 F.2d 505 (2d Cir. 1964).

Atlantic Richfield Co. v. Razumic,  390 A.2d 736, 740 (Pa. 1978).

Plaintiffs' antitrust claims relate, in whole or in part, to contractual provisions set forth in the franchise agreements at issue.  For example, plaintiffs claim that GNC engaged in predatory behavior by controlling the products that franchise stores may sell and restricting the suppliers with whom franchise stores may deal.  The agreements, however, specifically address the franchisee's duties to purchase inventory from GNC, its affiliates, or an approved supplier and in categories and minimum quantities specified in the GNC Inventory Plan.  See Ex. A at 14-16; Ex. B at 14-17.  Plaintiffs complain that GNC imposed "slotting" requirements to ensure that franchise stores carry the products most profitable to GNC by requiring in the agreements that franchisees must sell or offer for sale only products and services that are expressly approved in writing by GNC.  See id.  Based upon the facts asserted by plaintiffs and drawing all reasonable inferences in favor of plaintiffs, plaintiffs' claims cannot be viewed independently of the franchising relationship between the parties and the contractual obligations of the franchise agreements.

**B. The Sherman Antitrust Act Claims**

**(1) Statutory Framework**

Plaintiffs allege that a variety of GNC's practices constitute antitrust violations under

sections 1 and 2 of the Sherman Act.

**(a) Section 1 of the Sherman Antitrust Act**

Section 1 of the Sherman Act provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal." 15 U.S.C. § 1.  Although this language may suggest a broad restriction on commercial restraints, the United States Supreme Court repeatedly has made clear that this provision covers only unreasonable restraints of trade.  See National Collegiate Athletic Ass'n v. Board of Regents, 468 U.S. 85, 98 n. 17 (1984) (explaining that "every contract is a restraint of trade, and as we have repeatedly recognized, the Sherman Act was intended to prohibit only unreasonable restraints of trade") (collecting cases); Rossi v. Standard Roofing, 156 F.3d 452, 462 (3d Cir.1998).

In determining whether a defendant's conduct unreasonably restrains trade in violation of section 1 of the Sherman Act, courts generally apply one of two analytical methods, depending on the nature of the concerted action at issue.  Rossi v. Standard Roofing, 156 F.3d 452, 461 (3d Cir.1998).  Courts examine agreements using either (a) the so-called "rule of reason" analysis, "whereby the fact finder 'weighs all of the circumstances of a case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition,'" or (b) by applying a per se rule, which dispenses with the need for case-by-case analysis.  Id. (quoting Business Elecs. Corp. v. Sharp Elecs. Corp., 485 U.S. 717, 723 (1988)).  Under the per se standard, conduct that is "manifestly anticompetitive" or "would always or almost always tend to restrict competition," is presumed unreasonably to restrain competition "without elaborate inquiry as to the precise harm [it has] caused or the business excuse for [its] use."  Id. (quoting Northern Pac. Ry. v. United States, 356 U.S. 1, 5 (1958)).  Courts apply per se rules

11

against certain practices because "of [their] pernicious effect on competition and lack of any redeeming virtue." Id. (quoting Northern Pac. Ry., 356 U.S. at 5).[2]

**(b) Section 2 of the Sherman Antitrust Act**

Section 2 of the Sherman Act sanctions those "who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 2. There are two elements for the offense of monopoly under section 2: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 596 n. 19 (1985) (quoting United States v. Grinnell Corp., 384 U.S. 563, 570-571 (1966)). The offense of attempted monopoly under section 2 of the Sherman Act requires has three elements: "a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456 (1993). With respect to the third element, in order to prove whether there is a dangerous probability of monopolization, a court must inquire "into the relevant product and geographic market and the defendant's economic power in that market." Id. at 459. Plaintiffs did not clearly state in their

---

[2]In addition, the United States Court of Appeals for the Third Circuit has recognized a third standard that falls somewhere between rule of reason analysis and a per se rule. Rossi, 156 F.3d at 461. The court of appeals refers to this middle ground as an abbreviated or "quick look" rule of reason analysis. Id. (citing Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1367 n. 9 (3d Cir. 1996); United States v. Brown Univ., 5 F.3d 658, 669 (3d Cir. 1993)). This "quick look" analysis "applies 'where per se condemnation is inappropriate, but where a full-blown industry analysis is not required to demonstrate the anticompetitive character of an inherently suspect restraint.'" Id.

complaint whether their claims under section 2 are based upon a monopoly or attempted monopoly offense.  For the purposes of this motion to dismiss, the court will assume that plaintiffs have pled both offenses, and will examine each alleged offense.

**(2) Relevant Market**

Defendants first argue that, as a threshold matter, plaintiffs asserting antitrust injury under section 1 or section 2 of the Sherman Act must plead a relevant market.  See Bishop v. GNC Franchising LLC, 403 F.Supp.2d 411, 419 (W.D.Pa. 2005).  This court disagrees.  As noted in the standard of review, there is no heightened pleading standard for Sherman Act claims.  See Lum v. Bank of America, 361 F.3d 217, 220 (3d Cir. 2004).  Notice pleading is all that is required.  See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit, 507 U.S. 163, 168-69 (1993).  Notwithstanding the notice pleading standard, plaintiffs assert that they did in fact plead a relevant market.  Plaintiffs list in their second amended complaint numerous "relevant markets" in which defendants operate.  Pl.'s Sec. Am. Comp. ¶5((1)-(29).  The "relevant market" underlying their Sherman Act claims, however, is the market for products and supplies that are necessary to operate a GNC franchise.  The issue here is thus whether the relevant market pled will subject the Sherman Act claims to dismissal because the specific facts pled, even drawing all reasonable inferences in plaintiffs' favor, fail to state a claim or support a valid defense.  See ALA, Inc., 29 F.3d at 859; Jefferson, 90 F.3d at 1296; Camero v. Kostos, 253 F. Supp. at 338; see also 5 CHARLES ALLEN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1226 (3d ed. 2004).

Plaintiffs have the burden of defining the relevant market.  Queen City Pizza, 124 F.3d at 436-38 (citing Pastore v. Bell Telephone Co. of Pennsylvania, 24 F.3d 508, 512 (3d Cir. 1994) and Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 726 (3d Cir. 1991)).  The boundaries

of a product market are determined by the reasonable interchangeability of use or the

cross-elasticity of demand between the product itself and substitutes for it.  See Queen City

Pizza, 124 F.3d at 436-38 (citing Brown Shoe Co. v. United States, 370 U.S. 294 (1962)).  A

plaintiff, thus, must define its proposed relevant market with reference to the rule of reasonable

interchangeability and cross-elasticity of demand.  "Where the plaintiff fails to define its

proposed relevant market with reference to the rule of reasonable interchangeability and

cross-elasticity of demand, or alleges a proposed relevant market that clearly does not

encompass all interchangeable substitute products even when all factual inferences are granted in

plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be

granted."  Queen City Pizza, 124 F.3d at 436.[3]

---

[3]Queen City Pizza relied upon several decisions:

See, e.g., TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1025 (10th Cir.1992) (affirming district court's dismissal of claim for failure to plead a relevant market; proposed relevant market consisting of only one specific television channel defined too narrowly); Tower Air, Inc. v. Federal Exp. Corp., 956 F.Supp. 270 (E.D.N.Y.1996) ("Because a relevant market includes all products that are reasonably interchangeable, plaintiff's failure to define its market by reference to the rule of reasonable interchangeability is, standing alone, valid grounds for dismissal."); B.V. Optische Industrie De Oude Delft v. Hologic, Inc., 909 F.Supp. 162 (S.D.N.Y.1995) (dismissal for failure to plead a valid relevant market; plaintiffs failed to define market in terms of reasonable interchangeability or explain rationale underlying narrow proposed market definition); Re- Alco Industries, Inc. v. Nat'l Center for Health Educ., Inc., 812 F.Supp. 387 (S.D.N.Y.1993) (dismissal for failure to plead a valid relevant market; plaintiff failed to allege that specific health education product was unique or explain why product was not part of the larger market for health education materials); E. & G. Gabriel v. Gabriel Bros., Inc., No. 93 Civ. 0894, 1994 WL 369147 (S.D.N.Y.1994) (dismissal for failure to plead valid relevant market; proposed relevant market legally insufficient because it clearly contained varied items with no cross-elasticity of demand).

Queen City Pizza, 124 F.3d at 436-37.

In this case, as in Queen City Pizza, which also involved antitrust claims asserted by franchisees, the relevant market analyses required under section 1 and section 2 of the Sherman Act are the same because plaintiffs' claims under both sections relate to the market for products and supplies that GNC franchisees require to operate their GNC stores.  See id. at 442 n.18.  For example, the section 1 conspiracy claim points to GNC's pricing and marketing practices in this market for products and supplies as its basis.  Id. ¶100-101.  The predatory pricing practices and monopoly and attempted monopoly claims alleged under section 2 also relate to GNC determining prices for products and supplies that are needed for franchisees to operate their stores.  Pl.'s Sec. Am. Comp. ¶80-89.   As in Queen City Pizza, this threshold inquiry into the relevant market based upon the facts pled and accepted as true is a dispositive issue for the Sherman Act claims raised by plaintiffs.  A close review of Queen City Pizza, therefore, is instructive in this case.

**(3) Queen City Pizza**

In Queen City Pizza, the plaintiffs alleged that the exclusive dealing relationships established by Domino's Pizza, Inc. ("Domino's") had unreasonably restrained trade and constituted unlawful "tying" in violation of section 1 of the Sherman Act and that Domino's had monopolized and attempted to monopolize the market in pizza supplies and ingredients for use in Domino's pizza stores in violation of section 2 of the Sherman Act.  124 F.3d at 436.[4]  The district court dismissed plaintiffs' antitrust claims for failure to define a valid relevant market.  See id. at 437.  On appeal, the plaintiffs argued that the "ingredients, supplies, materials, and

---

[4]By reason of the plaintiffs raising for the first time on appeal the claim that Domino's had monopolized the "market for reasonably interchangeable franchise opportunities facing prospective franchisees" in violation of section 2 of the Sherman Act, the court of appeals did not decide issues relating to that claim.  Queen City Pizza, 124 F.3d at 436.

distribution services used by and in the operation of Domino's pizza stores" constituted a

relevant market for antitrust purposes.  Id.  The United States Court of Appeals for the Third

Circuit disagreed.

The court of appeals noted that the outer boundaries of a relevant market are determined

by reasonable interchangeability of use.  Id. (citing, inter alia, Eastman Kodak, 504 U.S. at 482).

The court of appeals further noted with respect to reasonable interchangeability of use:

> "Interchangeability implies that one product is roughly equivalent to another for
> the use to which it is put; while there may be some degree of preference for the
> one over the other, either would work effectively. A person needing
> transportation to work could accordingly buy a Ford or a Chevrolet automobile,
> or could elect to ride a horse or bicycle, assuming those options were feasible."

Id. (quoting Allen-Myland, Inc. v. International Business Machines Corp., 33 F.3d 194, 206 (3d

Cir. 1994)).  Courts assessing reasonable interchangeability should consider factors including

price, use, and qualities.  Id. (citing Tunis Brothers, 952 F.2d at 722).

Reasonable interchangeability is also indicated by "cross-elasticity of demand" between

the product and substitutes for the product, see id. (citing Brown Shoe Co. v. United States, 370

U.S. 294, 325 (1962)), where cross-elasticity of demand is the measure of the substitutability

between products from the point of view of buyers of those products or, more technically, "the

measure of the responsiveness of the demand for one product to changes in the price of a

different product."  See id. n.6 (citing E. THOMAS SULLIVAN AND JEFFREY L. HARRISON,

UNDERSTANDING ANTITRUST AND ITS ECONOMIC IMPLICATIONS  217 (1994)).  In Queen City

Pizza, the court of appeals determined that the dough, tomato sauce, and paper cups approved by

Domino's and used by Domino's stores were interchangeable with dough, sauce, and cups from

other suppliers.  Id. at 438 (noting that, indeed, it was the availability of interchangeable

ingredients of comparable quality at a lower price that motivated the lawsuit).  The court of

16

appeals held, therefore, that the relevant market in that case, defined to include all reasonably interchangeable products, included the ingredients and supplies from other sources and could not be restricted to solely those ingredients and supplies approved by Domino's for its franchisees. Id.  The court of appeals rejected the plaintiffs' proposed relevant market definition, which was restricted solely to those ingredients and supplies approved by Domino's.  Id.

The court of appeals noted that the Domino's–approved pizza ingredients and supplies differed from other available ingredients and supplies in one crucial manner:  Only Domino's–approved products could be used by Domino's franchisees without violating the standard franchise agreement.  Id.  The court of appeals, however, disagreed with the plaintiffs that this difference was sufficient to create a relevant market in approved products.  Id.  The court of appeals commented that "the test for a relevant market is not commodities reasonably interchangeable by a *particular plaintiff*, but 'commodities reasonably interchangeable by *consumers* for the same purposes.'"  Id. (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 395 (1956); Tunis Brothers, 952 F.2d at 722)(emphasis added)).

Congress designed the Sherman Act, after all, to protect consumer welfare by protecting competition itself, not particular competitors.  See Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 458 (1993) (The purpose of the Sherman Act "is not to protect businesses from the working of the market; it is to protect the public from the failure of the market."); see also Concord v. Boston Edison Co., 915 F.2d 17, 21 (1st Cir. 1990) (Breyer, C.J.) ("[A] practice is not 'anticompetitive' simply because it harms competitors. . . . Rather, a practice is 'anticompetitive' only if it harms the competitive process."); PHILLIP E. AREEDA & HERBERT HOVENKAMP, IIA ANTITRUST LAW 149 (2002) [hereinafter "AREEDA & HOVENKAMP"] ("[I]n the absence of true market power, rival suppliers or other business entities cannot be injured because the remaining

17

market outside the contract remains competitive.")  The court of appeals explained in Queen City Pizza that a court making a relevant market determination for antitrust purposes looks not to the contractual restraints assumed by a particular plaintiff when determining whether a product is interchangeable, but to the uses to which the product is put by consumers in general.  Id.  In Queen City Pizza the relevant inquiry was not whether a Domino's franchisee could reasonably use both approved or non-approved products interchangeably without triggering liability for breach of contract, but whether pizza makers in general might interchangeably use the products. Id.  The court of appeals held that they could.  Id.

The court of appeals noted that were the court to adopt the position that contractual restraints render otherwise identical products non-interchangeable for purposes of relevant market definition, any exclusive dealing arrangement, output or requirement contract, or franchise tying agreement would support a claim for violation of antitrust laws.  Id.; see AREEDA & HOVENKAMP 149 ("[G]iven the ubiquity of contractual lock-in . . ., finding a "relevant market" on such a basis would turn antitrust into an engine for resolving contract disputes generally, and perhaps even for interfering with perfectly valid contracts. . . .").  The court of appeals commented in Queen City Pizza that, perhaps for this reason, no court had defined a relevant product market with reference to the particular contractual restraints of the plaintiff and the only decisions the court found involving similar claims rejected the plaintiffs' position as a matter of law.  Id.[5]

_____

[5]Queen City Pizza cited the following decisions in support:

United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exchange, 89 F.3d 233 (5th Cir. 1996) ("Economic power derived from contractual arrangements such as franchises or in this case, the agents' contract with Farmers', has nothing to do with market power, ultimate consumers' welfare, or antitrust.") (internal citation

The court of appeals in <u>Queen City Pizza</u> reasoned that the plaintiffs were required to purchase products from Domino's not because of Domino's market power over a unique product, but because they were bound by contract to do so.  <u>Id.</u> at 439-41.  If Domino's acted unreasonably under the franchise agreement when it restricted the plaintiffs' ability to purchase supplies from other sources, the plaintiffs' remedy, if any, was in contract, not under the antitrust laws.  <u>Id.</u> at 441.

The analysis in <u>Queen City Pizza</u> is controlling in this case.  Here, plaintiffs' antitrust allegations, accepted as true for purposes of this motion to dismiss, like those at issue in <u>Queen City Pizza</u>, are premised largely on the contractual requirements relating to pricing and supply that GNC imposes on its franchisees.  Plaintiffs allegations of predatory pricing, monopoly, attempted monopoly, and an agreement with company-owned stores and third-party suppliers unreasonably to restrain trade are based upon GNC's control over the price at which franchisees purchase their inventory, what inventory they purchase, and from whom they purchase the inventory.  The relevant market for purposes of antitrust analysis in this case, under <u>Queen City Pizza</u>, however, must be defined to include all reasonably interchangeable products that could be sold at health nutrition stores, and the supplies needed to operate health nutrition stores, including products and supplies from sources other than those approved by GNC.  <u>See Id.</u> at 438; <u>see also</u> AREEDA & HOVENKAMP 147-157 (discussing with approval the reasoning in <u>Queen City</u>

---

and quotation omitted), <u>cert</u>. <u>denied</u>, 519 U.S. 1116 (1997); <u>Ajir v. Exxon Corp.</u>, No. C 93-20830, 1995 WL 429234, at *3 (N.D.Ca. July 7, 1995) ("Just because Exxon's direct serve dealers may contractually purchase gasoline from only one source – Exxon – does not mean that the relevant market is Exxon gasoline"; the correct relevant market is all gasoline)).

<u>Queen City Pizza</u>, 124 F.3d at 438.

Pizza, arguing that a contractual lock-in such as that in franchise tying claims does not create market power for antitrust purposes).  The proposed relevant market defined by plaintiffs, which does not include all reasonably interchangeably products and supplies for health nutrition stores but is limited to only those products and supplies approved by GNC, cannot support claims under the Sherman Act.

**(4) Plaintiffs' Arguments**

During oral argument at the hearing on the motion to dismiss, plaintiffs principally relied upon three arguments in their opposition to the motion to dismiss the Sherman Act claims.  First, plaintiffs argue that Queen City Pizza is distinguishable from this case because the restrictions at issue in Queen City Pizza were clearly set forth in the applicable franchise agreements and were known by prospective franchisees before the franchise agreements were signed, and therefore, the pre-market conditions immunized what otherwise would have been illegal market practices, citing Little Caesar Enterprises, Inc. v. Smith, 34 F.Supp.2d 459 (E.D. Mich. 1998).  Second, and intertwined with the first argument, plaintiffs argue that, based upon the Supreme Court's decision in Eastman Kodak, the "aftermarket" for products and supplies approved by defendants is the appropriate "relevant market" for purposes of plaintiffs' Sherman Act claims.   Finally, plaintiffs argue that some of the alleged violations constitute per se antitrust violations, and as such, plaintiffs do not need to define a relevant market.  The court will address each of these arguments in turn.

**(a) Little Caesar Distinguished**

Little Caesar involved an exclusive licensing agreement that a franchisor, Little Caesar Enterprises, Inc. ("LCE"), signed with a distributor, Blue Line Distributing, Inc. ("Blue Line").  Little Caesar, 34 F.Supp.2d at 464.  Blue Line was a wholly owned subsidiary of LCE that

ultimately merged with LCE.  Id.  The licensing agreement gave Blue Line the exclusive right to distribute all logoed products (i.e., all items bearing the Little Caeser mark, including napkins, cups, bags, etc.) to LCE's franchisees.  Id.  The licensing agreement initially was not disclosed to certain franchisees.  Id. at 465.  The plaintiffs claimed that LCE was using the licensing right on logoed products to preclude alternate sources of supply and competition on these items, and that the result of the licensing agreement for logoed products was  a tie-in of the entire "market basket" of goods needed to operate a Little Caesar franchise.  Id.  A class was certified to determine whether there was an illegal tie between the continued operation of a Little Caesar franchise and the purchase of logoed products from Blue Line and whether the practical effects of the tying of logoed goods to continuing a franchise caused barriers to entry.  Id. at 466.  The district court, adopting the report and recommendation of the magistrate judge, ultimately held that summary judgment had to be denied because a material fact was disputed.  Specifically, whether a potential franchisee could know or reasonably anticipate whether a rival distributor would be unable to enter the market and compete with Blue Line constituted a disputed issue of material fact under plaintiffs' illegal tying or "lock-in" theory.  Id. at 508 ("Thus, under Kodak . . . , there is a potential that the franchisor could take advantage of the franchisees' ignorance on this non-obvious fact by implementing an unanticipated change of policy to preclude rival distributors from entering the market by denying them access to logoed products after franchisees had signed their . . . Franchise Agreement and become "locked in.").

Plaintiffs' reliance here on Little Caesar appears to be based upon the argument that restrictions for continuing a franchise that were not disclosed to franchisees at the time of signing the franchise agreement – such as purchasing products subject to an exclusive distribution agreement – but which later are imposed, create a "lock-in" for purposes of the

Sherman Act.  This reliance, however, is misplaced.  Even assuming plaintiffs' reading of <u>Little Caesar</u> is correct, and assuming that the district court in <u>Little Caesar</u> applied the proper rationale, the franchise agreements in this case, contrary to counsel's assertions at oral argument, contemplated the kind of restrictions at issue.  For example, the franchise agreements provided that, among a franchisee's other duties, a franchisee must purchase inventory from GNC or its affiliates or from an approved supplier in categories and minimum quantities specified in the GNC Inventory Plans and must sell or offer for sale only products and services that have been expressly approved in writing by GNC.  <u>See</u> Ex. A at 14-16; Ex. B at 14-17.  In addition, the franchise agreements provide notice that the "[f]ranchisor reserves the right to modify the General Nutrition Center Inventory Plan, or Plan-O-Grams, by providing reasonable advance notice of such changes to Franchisee."  Ex. A at 12 (provision VI.B); Ex. B at 14 (provision VI.B).

### (b) Plaintiffs' Aftermarket Theory

Plaintiffs also misapply <u>Little Caesar</u> and <u>Little Caesar</u>'s reading of <u>Eastman Kodak</u>. <u>Eastman Kodak</u> did not hold that the mere presence of information and switching costs, or a claim of being "locked-in," alone support a claim that the relevant market in an antitrust case between a franchisor and its franchisees is the "aftermarket" of only those supplies and products approved by the franchisor for franchisees.  <u>See</u> <u>Queen City Pizza</u>, 124 F.3d at 439-40 (rejecting the argument that  "under [<u>Eastman Kodak</u>], the fact that [plaintiff franchisees] are "locked in" supports their claim that an "aftermarket" for Domino's-approved supplies is a relevant market for antitrust purposes.").

> In [<u>Eastman Kodak</u>], the Supreme Court observed that a market is defined with
> reference to reasonable interchangeability. . . . The Court held that the market for
> repair parts and services for Kodak photo-copiers was a valid relevant market

22

> because repair parts and services for Kodak machines are not interchangeable
> with the service and parts used to fix other copiers.  Plaintiffs suggest that
> [Eastman Kodak] supports its proposed relevant market because it indicates that
> in some circumstances, a single brand of a product or service may constitute a
> relevant market. This is correct where the commodity is unique, and therefore not
> interchangeable with other products. But here, it is uncontested that contractual
> restraints aside, the sauce, dough, and other products and ingredients approved for
> use by Domino's franchisees are interchangeable with other items available on the
> market.

Id. (citations omitted).  The relevant market in Queen City Pizza was not the "aftermarket" in

approved products and supplies:

> Plaintiffs contend that they face information and switching costs that "lock them
> in" to their position as Domino's franchisees, making it economically
> impracticable for them to abandon the Domino's system and enter a different line
> of business. They argue that under  [Eastman Kodak], the fact that they are
> "locked in" supports their claim that an "aftermarket" for Domino's-approved
> supplies is a relevant market for antitrust purposes. We believe plaintiffs misread
> [Eastman Kodak].

Id.  Instead, as noted by the court of appeals, the Supreme Court in Eastman Kodak more

narrowly held that whether there was cross-elasticity of demand between parts and copiers was a

factual question that could not be determined as a matter of law.  See id.  The Court reached this

conclusion because switching and information costs arise when one purchases an expensive

piece of equipment like a copier and, in some circumstances, those costs might create an

economic lock-in that could reduce or eliminate the cross-elasticity of demand between copiers

and the repair parts for those copiers.  Id

In Queen City Pizza, the court of appeals explained:

> [Eastman Kodak], we believe, held that a plaintiff's proposed relevant market in a
> unique and non-interchangeable derivative product or service cannot be defeated
> on summary judgment by a defendant's assertion that the proposed derivative
> market is cross-elastic with the primary market, if there is a reasonable possibility
> that the defendant's assertion about cross-elasticity is factually incorrect. But
> [Eastman Kodak] does not hold that the existence of information and switching
> costs alone, such as those faced by the Domino's franchisees,  renders an

23

otherwise invalid relevant market valid.

Id. In Eastman Kodak it was significant to the Supreme Court that the repair parts and service in the "aftermarket" were unique and non-interchangeable and, because a question of fact about cross-elasticity remained, the Court held that judgment as a matter of law was inappropriate. Id. at 439-440. In Queen City Pizza, however, and in this case, the facts pled, even drawing all reasonable inferences in favor of plaintiffs, show that the franchisor–approved products and supplies are fully interchangeable with other products and supplies outside the proposed relevant market. See id. For this reason, the dismissal of plaintiffs' antitrust claims is appropriate.

**(c) Per Se Violations**

Plaintiffs' third argument, that plaintiffs need not define a relevant market because plaintiffs' allegations of naked price fixing are per se unlawful, also fails. See Bishop, 403 F.Supp.2d at 422 ("Plaintiffs argue that because its alleged [s]ection 1 violations are per se unlawful, no proof of relevant markets is necessary. Plaintiffs are wrong.") (citing Queen City Pizza, Inc. v. Domino's Pizza, Inc., 922 F.Supp. 1055, 1060 (E.D.Pa.1996) ("in order to state a Sherman Act claim under either § 1 or § 2, a plaintiff must identify the relevant product and geographic market and allege that the defendant exercises market power within those markets"), aff'd, 124 F.3d at 436.).

 Courts have found certain practices to be so "obviously anticompetitive" that they are presumed to be unreasonable and therefore illegal without detailed examination. See Northern Pac. Ry. Co. v. United States, 356 U.S. at 5; Bogan v. Hodgkins, 166 F.3d 509, 514 (2d Cir. 1999). These practices have included group boycotts, division of markets, and tying arrangements. Bogan, 166 F.3d at 514. The majority of allegedly anticompetitive conduct, however, continues to be examined under the rule of reason, and courts have been reluctant to

24

expand the categories of per se illegality.  Id.  (citing, inter alia, Bunker Ramo Corp. v. United Business Forms, Inc., 713 F.2d 1272, 1284 (7th Cir. 1983) ("A particular course of conduct will not be termed a per se violation . . . until the courts have had considerable experience with that type of conduct and application of the rule of reason has inevitably resulted in a finding of anticompetitive effects.").  Moreover, the Supreme Court has "warned against 'indiscriminately' expanding 'the category of restraints classed as group boycotts,' noting that 'the per se approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor.'"  Id. (quoting FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 458 (1986)).  "The Supreme Court is 'slow to . . . extend per se analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious."  Id.

Here, plaintiffs allege per se illegality of elements of a business practice known to have procompetitive benefits – the franchise.  Indeed, as recognized in Queen City Pizza:

> Franchising is a bedrock of the American economy. . . . More than one third of all dollars spent in retailing transactions in the United States are paid to franchise outlets. . . . We do not believe the antitrust laws were designed to erect a serious barrier to this form of business organization.

124 F.3d at 441.  Though group boycotts and tying arrangements have been held in some cases to be per se illegal conduct, see Bogan, 166 F.3d at 514, these kinds of activities in the context of franchising have not.  See Queen City Pizza, 124 F.3d at 441.  This result is in part due to the procompetitive benefits that franchising brings about.  See United States v. Arnold, Schwinn & Co., 388 U.S. 365, 387 (1967) (Stewart, J., concurring in part and dissenting in part) ("Indiscriminate invalidation of franchising arrangements would eliminate their creative contributions to competition and force suppliers to abandon franchising and integrate forward to

the detriment of small business.  In other words, we may inadvertently compel concentration by

misguided zealousness.").[6]  See Queen City Pizza, 124 F.3d at 441 n.14 (quoting Justice

Stewart's opinion concurring in part, dissenting in part, in Arnold); GTE Sylvania Inc. v.

Continental T. V., Inc., 537 F.2d 980, 998-99 (9th Cir. 1976) (en banc) (quoting, favorably

discussing, and adopting the reasoning of Justice Stewart's opinion concurring in part, dissenting

in part, in Arnold), aff'd, 433 U.S. 36 (1977); see also State Oil v. Khan, 522 U.S. 3, 11-12

(1997) (noting that the majority opinion in Arnold, which was later overruled, itself

acknowledged that some vertical restrictions, including the conferral of territorial rights and

franchises, could have procompetitive benefits by allowing smaller enterprises to compete, and

that such restrictions might avert vertical integration in the distribution process).

**(5) Dismissal of Sherman Act Claims**

GNC's abilities to block franchisees from purchasing products and supplies from non-

approved sources – and to determine the prices charged *to* franchise stores and *by* franchise

stores – stem from GNC's exercise of its contractual powers, not market power.  As in Queen

City Pizza, the remedy for this problem is not an antitrust lawsuit.  Id. at 444.  By reason of

plaintiffs having defined a relevant market that is legally insufficient, the court shall dismiss

plaintiffs' claims under section 1 and section 2 of the Sherman Act.

**C. The Robinson-Patman Act**

The Robinson-Patman Act, which amended the Clayton Act, prohibits price

---

[6]The majority's opinion in Arnold that a supplier's imposition of territorial restrictions on
a distributor was "so obviously destructive of competition" as to constitute a per se violation was
later overturned. Continental T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36 (1977) (overruling the
per se rule for non-price vertical restrictions set forth in Arnold in favor of the rule of reason
approach).  See State Oil v. Khan, 522 U.S. 3, 11 (1997) (discussing Arnold).

discrimination "where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly." 15 U.S.C. § 13(a).[7]  See Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc., 159 F.3d 129, 142 (3d Cir. 1998) (upholding district court's dismissal of Sherman Antitrust Claims and Robinson-Patman Act claims for failure to state a claim).   There are two elements a plaintiff must prove to establish a claim under the Robinson-Patman Act: (1) the defendant made at least two contemporary sales of the same commodity at different prices to different purchasers; and (2) the effect of such discrimination was to injure competition.  See Crossroads Cogeneration Corp., 159 F.3d at 142 (citing Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 219-27 (1993)).

Here, plaintiffs claim that the GNC defendants violated the Robinson-Patman Act because GNC sold products to company-owned stores at different and lower prices than GNC sold products to franchise stores.  Pl.'s Sec. Am. Compl. ¶¶90-91.  Plaintiffs claim that this price discrimination had a reasonable possibility of substantially lessening competition among GNC company-owned stores, GNC franchises, and outside competitors including Rite Aid and Drugstore.com because the pricing caused plaintiffs to lose customers, profits, business, and

---

[7]15 U.S.C.A. § 13 (a) provides in relevant part:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or place under the jurisdiction of the United States, and where the effect of such discrimination other may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

franchise.  Id. ¶¶92-95.  Plaintiffs argue that the discounts to company-owned stores were not

functional, cost-justified, a good faith attempt to meet the low prices of a competitor, or cost-

based in any way.  Id. ¶¶96-99.  In response, defendants argue that on the basis of the facts pled

and accepted as true for purposes of deciding this motion to dismiss, which include the fact that

GNC owns the company-owned stores, plaintiffs cannot state a claim for relief because the

transfers between GNC and its company-owned stores constitute transfers between a parent

corporation and its wholly owned subsidiaries and, as such, are beyond the ambit of the

Robinson-Patman Act.

 Though the United States Court of Appeals for the Third Circuit has not squarely

addressed this issue, the United States Courts of Appeals for the First, Fifth, Sixth, and Eighth

Circuits have held that transfers between a parent and its wholly owned subsidiary are beyond

the ambit of the Robinson-Patman Act as a matter of law.  See Bishop, 403 F.Supp.2d at 420

(citing, for example, Security Tire & Rubber Co. v. Gates Rubber Co., 598 F.2d 962, 967 (5th

Cir. 1979) ("transfers between parent and wholly owned subsidiary are not the type of

transactions the Robinson-Patman Act meant to regulate"), cert denied, 444 U.S. 942 (1979));

see also Russ' Kwik Car Wash v. Marathon Petroleum Co., 772 F.2d 214, 221 (6th Cir. 1985);

City of Mount Pleasant, Iowa v. Assoc. Elec. Co-op. Inc., 838 F.2d 268, 278-79 (8th Cir. 1988);

Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft, 19 F.3d 745 (1st Cir.

1994)(Breyer, C.J.).  The holdings of the courts of appeals that have considered the issue are

based upon the United States Supreme Court's holding in Copperweld Corp. v. Independence

Tube Corp., 467 U.S. 752 (1984), that a parent and a wholly owned subsidiary are a single

economic unit under the Sherman Act.  That holding has been construed to apply to the

Robinson-Patman Act as well.  See Bishop, 403 F.Supp. at 420-21.

In Copperweld, the Supreme Court overruled earlier cases that supported the "intra-enterprise conspiracy" doctrine, and held that "the coordinated activity of a parent and its wholly owned subsidiary must be viewed as that of a single enterprise for purposes of § 1 of the Sherman Act." Copperweld, 467 U.S. at 771-72.  In reaching this conclusion, the Court took into account the complete unity of interest, common objectives, and "that their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one."  Id. The Court noted that a parent and its wholly owned subsidiary "share a common purpose whether or not the parent keeps a tight rein over the subsidiary."  Id.  The Court added that a corporation has the power to maintain a portion of the enterprise either in the form of an unincorporated division, or in the form of a separately incorporated subsidiary, but that the economic, legal, or other considerations that lead corporate management to choose one structure over the other are not relevant to whether the enterprise's conduct seriously threatens competition and thus warrants antitrust scrutiny.  Id.  The Court determined that antitrust liability for "conspiring" could not attach to coordinated activity between a parent and its subsidiary.  See id. at 772-77.  Copperweld Corporation and its wholly owned subsidiary Regal Tube Company were thus found to be incapable of conspiring with each other for purposes of section 1 of the Sherman Act.  Id. at 777.

The reasoning in Copperweld has been applied to Robinson-Patman Act claims.  The coordinated activity of a parent and its wholly owned subsidiary in the form of transfers between them has been read to not support a price discrimination claim under the Robinson-Patman Act. For example, the United States Court of Appeals for the Sixth Circuit in Russ' Kwik Car Wash v. Marathon Petroleum Co., 772 F.2d 214, 221 (6th Cir. 1985), determined that "the parent and subsidiary are a single economic unit . . . . The Robinson-Patman Act is not concerned with

29

transfers between them." Id. (holding that the Robinson-Patman Act does not apply to sales between a petroleum company and its wholly owned subsidiary retail gasoline stations). The United States Court of Appeals for the Eighth Circuit in City of Mount Pleasant, Iowa v. Assoc. Elec. Co-op. Inc., 838 F.2d 268, 278-79 (8th Cir. 1988), followed the Russ' Kwik decision and adopted the Copperweld-inspired rule holding that the Robinson-Patman Act does not apply to sales between an electricity utility company and its retail-distribution electric cooperatives. The United States Court of Appeals for the First Circuit in Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft, 19 F.3d 745 (1st Cir. 1994) (Breyer, C.J.), acknowledged the application of the Copperweld doctrine in Russ' Kwik, City of Mount Pleasant, and other decisions to transfers between a parent and its wholly owned subsidiary and also held that a parent and its wholly owned subsidiary are a "single seller" for Robinson-Patman Act purposes. Id. at 748-49, 750-51 (holding that 100% ownership, by itself, without an analysis of control, amounts to a sufficient allegation that a parent and its subsidiary are a single Robinson-Patman Act "person"). The United States Court of Appeals for the Ninth Circuit, however, without deciding the issue, indicated that transactions between subsidiaries are not necessarily immune. Zoslaw v. MCA Distributing Corp., 693 F.2d 870, 879-880 (9th Cir. 1982) (reversing grant of summary judgment because material issues of fact concerning the "in commerce" requirement remained in case involving record and tape sales by parent manufacturers to wholly owned distributors), cert. denied, 460 U.S. 1085 (1983).

There is no dispute that GNC's company-owned stores are wholly owned subsidiaries of GNC. Plaintiffs' price discrimination claims are based upon the allegation that GNC charges its company-owned stores different and lower prices than it charges franchise stores. This court agrees with the weight of authority and finds that GNC and its company-owned stores are

considered one person for the purposes of the Robinson-Patman Act.  By reason of plaintiffs

pleading facts in their complaint sufficient to show that their claims under the Robinson-Patman

Act are not predicated on a comparison of transfers between GNC and plaintiffs and transfers

between GNC and different purchasers, plaintiffs cannot meet their burden of proving the first

element of a Robinson-Patman price discrimination claim.  Because the facts pled, even drawing

all reasonable inferences in favor of plaintiffs, show that plaintiffs are not entitled to relief on

their claim of price discrimination under the Robinson-Patman Act, the court shall dismiss this

claim with prejudice.


**II. State Law Claims**

Where, as here, dismissal of federal claims is warranted, this court may decline to

exercise supplemental jurisdiction over pendent state law claims.  See 28 U.S.C. 1367(c)(3);

Queen City Pizza, 124 F.3d at 444; Stehney v. Perry, 101 F.3d 925, 939 (3d Cir. 1996); Growth

Horizons, Inc. v. Delaware County, Pa., 983 F.2d 1277, 1284-85 (3d Cir. 1993).  This case is at

the motion to dismiss stage and significant resources of the parties and the judiciary have not yet

been expended.  Plaintiffs may avail themselves of the appropriate state forum to resolve their

state law claims.  Under these circumstances, the court can find no compelling reason to retain

jurisdiction over plaintiffs' state law claims and no prejudice to plaintiffs' from their dismissal.

This court will decline to exercise supplemental jurisdiction over plaintiffs' state-law claims –

which include breach of contract (Count I), breach of implied covenant of good faith and fair

dealing (Count II), breach of contract as third-party beneficiary (Count VIII), fraudulent

misrepresentation (Count IV), and negligent misrepresentation (Count V).  Those claims are

dismissed without prejudice.  See 28 U.S.C. § 1367; Queen City Pizza, 124 F.3d at 444; Stehney,

31

101 F.3d at 939; <u>Growth Horizons,</u> 983 F.2d at 1284-85 (3d Cir. 1993).


### *Conclusion*

**AND NOW**, this 29th day of June 2006, upon consideration of the

motion to dismiss the plaintiffs' second amended complaint (Doc. No. 28) filed by defendants,

**IT IS HEREBY ORDERED** that plaintiffs' federal antitrust claims under the Sherman Antitrust

Act and the Robinson-Patman Act are **DISMISSED WITH PREJUDICE** and plaintiffs'

remaining state law claims are **DISMISSED WITHOUT PREJUDICE**.   The clerk shall mark

this case closed.

By the court:


 /s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge


cc:      Counsel of Record